UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| CARLA M. MANCO,<br><br>            Plaintiff,<br><br>    vs.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of the Social Security<br>Administration,<br><br>            Defendant. | 4:18-CV-04080-VLD<br><br><br>MEMORANDUM OPINION<br>AND ORDER |

## INTRODUCTION

Plaintiff, Carla M. Manco, seeks judicial review of the Commissioner's

final decision denying her application for social security disability and

supplemental security income disability benefits under Title II and Title XVI of

the Social Security Act.[1]

---

[1]SSI benefits are called "Title XVI" benefits, and SSD/DIB benefits are called "Title II" benefits. Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference--greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any. There are corresponding and usually identical regulations for each type of benefit. See e.g. 20 C.F.R. §§ 404.1520 and 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI). Ms. Manco filed her application for both types of benefits. AR9, 857. Her coverage status for SSD benefits expires

Ms. Manco has filed a complaint and has requested the court to reverse the Commissioner's final decision denying her disability benefits and to enter an order awarding benefits. Alternatively, Ms. Manco requests the court remand the matter to the Social Security Administration for further proceedings.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g). The parties have consented to this magistrate judge handling this matter pursuant to 28 U.S.C. § 636(c).

## FACTS[2]

### A. Statement of the Case

This action arises from plaintiff, Carla M. Manco's, ("Ms. Manco's"), application for SSDI and SSI filed on June 25, 2015, alleging disability since April 15, 2013, due to a learning disability, dyslexia, anxiety, high blood pressure, high cholesterol, and depression. AR281, 288, 372 (citations to the appeal record will be cited by "AR" followed by the page or pages). Ms. Manco also raised issues of being unable to do well with others, memory problems, Methicillin-resistant Staphylococcus aureus ("MRSA"), a cyst on her kidney and neuropathy in her legs, feet, arms, and hands. AR389, 394-95, 401, 433.

---

on December 31, 2021. AR 10, 12, 296. In other words, in order to be entitled to Title II benefits, Ms. Manco must prove disability on or before that date.

[2] These facts are gleaned from the parties' stipulated statement of facts (Docket 16). The court has made only minor grammatical and stylistic changes.

Ms. Manco's administrative law judge hearing was held on June 28, 2017, by Jeffrey Holappa ("ALJ"). AR85. Ms. Manco was represented by other counsel at the hearing, and an unfavorable decision was issued on August 24, 2017. AR6, 85.

At Step One of the evaluation, the ALJ found that Ms. Manco had not engaged in substantial gainful activity ("SGA"), since the date of her alleged onset of disability, April 15, 2013, and that she met the insured status for her SSDI claim through December, 2021. AR12.

The ALJ found that Ms. Manco's work at Walgreens in August, 2013, and at Forum Communications in December, 2016, were both unsuccessful work attempts. AR12.

At Step Two, the ALJ found that Ms. Manco had severe impairments of degenerative disc disease of the cervical spine, small fiber neuropathy, post-traumatic stress disorder ("PTSD"), borderline intellectual functioning, attention deficit hyperactivity disorder, dyslexia, anxiety and depression. AR12.

The ALJ also found that Ms. Manco had been diagnosed with hypertension, hyperlipidemia, right carpal tunnel disease, obesity, right renal cyst, gastroesophageal reflux disease, and sleep apnea, but determined they were all non-severe. AR12.

At Step 3, the ALJ found that Ms. Manco did not have an impairment that met or medically equaled one of the listed impairments in 20 C.F.R. 404, Subpart P, App 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926) (hereinafter

3

referred to as the "Listings"). AR12. The ALJ considered the mental impairments under Listings 12.02, 12.04 12.06, 12.11, and 12.15 and found that Ms. Manco had moderate limitations in understanding, remembering, or applying information; moderate limitations in interacting with others; moderate limitations with concentration, persistence or maintaining pace; and mild limitations in adapting or managing herself, so did not meet a Listing. AR13-14.

The ALJ determined that Ms. Manco had the residual functional capacity ("RFC") to perform:

> less than the full range of medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except: the claimant is limited to lifting and carrying 50 pounds occasionally and 25 pounds frequently. The claimant is limited to sitting (with normal breaks) for about 6 hours out of an 8-hour workday. The claimant is limited to standing or walking (with normal breaks) for about 6 hours out of an 8-hour workday. The claimant is limited to pushing and pulling within the same weight limitations as lifting and carrying. The claimant is limited to occasional climbing of ladders, scaffolds or ropes. The claimant is limited to frequent balancing, stooping, kneeling, crouching, crawling and climbing ramps or stairs. The claimant is limited to occasional exposure to work hazards such as unprotected heights and moving mechanical parts. Mentally, the claimant is limited to understanding, remembering and carrying out simple, routine and repetitive tasks. The claimant is limited to making simple work-related decisions. The claimant is limited to occasional interaction with supervisors, coworkers and the general public.

AR14.

The ALJ found Ms. Manco's medically determinable impairments could reasonably be expected to produce the symptoms she alleged, but her statements concerning the intensity, persistence, and limiting effects of her

symptoms were not "entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." AR16.

The ALJ considered the opinions of the State agency medical consultants, who found that Ms. Manco did not have a severe impairment and gave them "only some weight" because evidence admitted at the hearing level has shown the claimant was more limited than originally determined with the development of cervical degenerative disc disease and small fiber neuropathy. AR19.

The ALJ considered the opinions of the State agency psychological consultants and gave them "great weight." AR19.

The ALJ considered the medical source statement completed by Ms. Manco's treating mental health provider, Dr. Fox, who identified multiple areas of "moderate" and multiple areas of "marked" limitations, and accepted the "moderate" limitations. AR19, 810-12. The ALJ rejected all "marked" limitations asserting they were "inconsistent with the mental status examination observations in the record as well as the testing results." AR19, 810-12 (medical source statement). The ALJ stated Dr. Fox's opinions were "afforded some weight to the extent they support the limitations in the residual functional capacity assessment" determined by the ALJ. AR19.

The ALJ gave "some weight" to the statement of the consultative psychological examiner, Galen Van Kley, Ph.D., who stated the claimant's employment opportunities would be limited by her intellectual deficits, even though she was capable of learning and retaining new information with

repeated exposure.  The ALJ's decision stated, "The undersigned accepts that the claimant is capable of performing repetitive tasks and that she is limited, but disabled."  AR19.

The ALJ noted in the decision that Ms. Manco's treating physician, Dr. Olegario, limited her to lifting no greater than 10 pounds "for now" in July, 2014.  AR16.

Based on the RFC determined by the ALJ, the ALJ first found that Ms. Manco was capable of performing her past relevant work as a hand packager, a medium exertion unskilled occupation, stating, "The undersigned accepts the vocational expert's opinion.  Accordingly, the claimant is unable[3] to perform past relevant work as actually or generally performed."  AR21.  The ALJ stopped the sequential evaluation at Step 4 and found Ms. Manco not disabled.  AR21.

The Appeals Council denied Ms. Manco's request for review making the ALJ's decision the final decision of the Commissioner.  AR1.

**B.    Plaintiff's Age, Education, and Work Experience.**

Ms. Manco was born January 31, 1965, and completed the 12th grade in 1983.  She stated that she attended special education classes.  AR121, 373.

The ALJ identified Ms. Manco's past relevant work as hand packager, medium exertion unskilled work, DOT# 920.587-018.  AR20.

---

[3] This appears to be a typographical error, because the in the previous sentence ALJ found Ms. Manco *was* able to perform her past relevant work.

**C.     Relevant Medical Evidence.**

**1.     Olegario Medical Clinic Records**

Ms. Manco was seen on January 22, 2014, to follow-up an emergency room visit due to right sided wrist pain. AR592. Ms. Manco reported at the emergency room visit that she had recently started a new job that required a lot of repetitive activity with her hands, and following examination, she had been assessed with overuse syndrome secondary to repetitive motion and activity with her hands. AR661-62. Examination revealed right wrist pain in a median nerve distribution, and her assessment was carpal tunnel syndrome. AR594. Ms. Manco complained of numbness and tingling as well as pain, and an EMG was obtained that revealed evidence of right median neuropathy at the wrist such as seen in carpal tunnel syndrome. AR547. Karen Garnaas, MD, stated the EMG showed neuropathy at the right wrist characteristic in carpal tunnel syndrome which was of "mild electrophysiologic severity. There is no evidence of a generalized sensorimotor polyneuropathy, cervical radiculopathy, or ulnar neuropathy." AR547. Ms. Manco had right carpal tunnel surgery on February 27, 2014. AR563, 588.

Ms. Manco was seen on July 23, 2014, complaining of low back pain and pain between her shoulder blades with symptoms she said were present off and on for years but worsening the past several days. AR577. Examination revealed mid and low back tenderness. AR579. Meloxicam and baclofen were prescribed and she was put on work restrictions with lifting no more than 10 pounds "for now." The physician stated that there did not appear to be any

worrisome spinal symptoms and her symptoms were potentially related to musculoskeletal discomfort. AR579.

Ms. Manco was seen again on July 29, 2014, with complaints of lower back pain mainly around her right flank. AR574. She said she had had significant pain and was observed to be obviously uncomfortable with, she said, an inability to sit long periods due to pain. AR574. Ms. Manco also reported right sided kidney pain, vertigo, and nausea. AR574. A CT with renal stone protocol was obtained that revealed a probable right ovarian cyst but no kidney stones. AR607.

Due to Ms. Manco's complaints of mid and low back pain, a lumbar spine x-ray series was obtained on July 30, 2014, that revealed very mild convex right thoracolumbar junction scoliosis and minimal bony spondylosis, but no other abnormal findings. AR606. In previously taken x-rays from April 2011, Tamara Wheeler, M.D., noted "slight spinal curvature" in the left lower thoracic spine and right upper thoracic spine. AR654. Her impression was "scoliotic curvature noted." AR654.

Ms. Manco was seen on April 13, 2015, to follow-up on a number of conditions including depression and refilling her Paxil medication. AR570. Her psychiatric history included ADD, anxiety, and depression. AR571. The record showed no barriers to learning, a readiness to learn and learning preferences including one-on-one, telephone instruction, verbal explanation, and written material. AR571. Ms. Manco had normal mood, affect, speech and thought processes. AR572.

Ms. Manco was seen with her mother on June 3, 2015, to discuss disability. AR566. Ms. Manco was noted to have no learning barriers. AR567. Her mood was depressed, and she had been under stress and was feeling more depressed. AR568. Ms. Manco reported being labeled with a learning disability while growing up and a possibility of dyslexia, and she said she had a difficult time maintaining employment despite help from her mother. AR568. Dr. Olegario stated Ms. Manco had a depressed mood, normal affect, speech and thought processes. AR568. Attention deficit disorder was assessed, and Vyvanse was prescribed. AR569.

### 2. AMG Internal Medicine Clinic Records

Ms. Manco was seen on March 18, 2016, for complaints of pain in both feet with achiness and burning in the balls of her feet into her toes and muscles of her legs. AR837, 840. Ms. Manco rated her bilateral foot pain as 8 out of 10, and she also complained of back, joint and muscle pain. AR838-39. Examination revealed bilateral lower extremity distal tenderness and bilateral hand pain. AR839.

Ms. Manco was seen on April 18, 2016, with complaints of continued foot and leg pain with pain in the bottom of her feet radiating up her legs and numbness and tingling below both feet. AR833, 836. She also complained of anxiety and stress on the day of the examination. AR833. Examination revealed depressed mood; normal affect, speech, and thought processes; and symptoms "consistent with" neuropathy in both feet, and Lyrica was prescribed. AR836.

Ms. Manco was seen on June 8, 2016, for complaints of continued bilateral leg pain and numbness. AR830. She rated her leg pain as 7 out of 10. AR831. Ms. Manco complained of a burning discomfort over her distal bilateral lower extremities and had similar symptoms over her hands to a milder degree. AR832. Dr. Olegario noted that back x-rays from the previous year did not show obvious disc disease. AR832. An MRI had been ordered but her insurance company denied coverage. AR832. An EMG was ordered, and gabapentin was prescribed to replace the Lyrica, which she had not tolerated. AR832.

### 3. Neurology Associates Records

Ms. Manco was referred to Neurology Associates and seen on July 18, 2016, for complaints of burning foot dysesthesias over the past year with more recent numbness and tingling in her hands, sometimes radiating up the arms. AR798, 800. Examination revealed some lost sensation in the lower extremities with temperature decreased to lower calves, cool at upper calves, and in the upper extremities pain was sharper at mid hands, temperature cooler at mid forearms. AR803. Ms. Manco was oriented, with intact recent and remote memory, good attention span and fund of knowledge, spontaneous speech, and a full range of affect. AR803. Ms. Manco had normal strength in her wrists, fingers, and hands. She had intact fine-finger movements and finger-nose-finger testing "without tremor or ataxia." AR803. Her gait was somewhat antalgic but otherwise her heel, toe, and tandem gaits were normal. AR803. Ms. Manco's Romberg's sign was normal. AR803. EMG testing

showed minimal evidence of right carpal tunnel syndrome "no definite radiculopathy or large fiber neuropathy." AR799. Dr. Olegario would "consider skin biopsy for small fiber neuropathy." AR799. He ordered brain and cervical MRIs and prescribed gabapentin. AR799.

An EMG of Ms. Manco's upper extremities was obtained on July 18, 2016, and was minimally abnormal on the right with median palmar sensory distal latency "just slightly outside of the normal range" raising the possibility of mild median neuropathy at the right wrist such as seen in carpal tunnel syndrome. AR807. Karen Garnaas, M.D., saw no evidence of a similar process affecting the left upper arm and no cervical abnormalities affecting either upper limb. AR807.

A cervical spine MRI was obtained on July 21, 2016, which revealed degenerative disc disease with disc protrusions and bulging at C4-5, C5-6, and C6-7 without significant spinal stenosis, cord compression, or demyelinating disease. AR806.

A brain and stem MRI was obtained on July 21, 2016, which revealed three small foci of white matter T2 hyperintensity in the left frontal lobe, right frontal lobe and right periatrial white matter, which were nonspecific, although not inconsistent with demyelinating disease. AR805. The suspicion of demyelination was low. AR793.

Ms. Manco was seen on September 9, 2016, for follow-up and reported continued tightness of the ankles in the morning with some tingling and burning, but overall her symptoms were about 50% improved versus the 8/10

previously reported. AR794. She reported that her symptoms were worse if she was on her feet a lot, and her right knee felt unstable and was randomly giving out. AR794. Ms. Manco also reported her left hand randomly felt swollen and numb, but her hand symptoms seemed less severe since starting gabapentin. AR794.

Ms. Manco was seen on March 15, 2017, by Becky Emerson, PA-C, to follow up on her neuropathic symptoms felt to be small fiber neuropathy, which could not be ruled out. AR788. Small fiber sensory neuropathy could not be excluded with routine electrodiagnostic studies. AR789. She reported that she felt her symptoms were manageable, but her foot symptoms increased significantly with prolonged standing. AR788. Ms. Manco also said she had fairly mild tightness, numbness, and tingling of her hands up to her shoulders intermittently, and her ankles are always tight with intermittent foot cramps, mild foot to hip numbness, and tingling that comes and goes, and had recently fallen when her right leg gave out. AR788. Ms. Emerson noted that Ms. Manco was pleasant, cooperative, and in no apparent distress. AR788. Ms. Manco was oriented, had intact recent and remote memory, good attention span, good fund of knowledge, and a full range of affect. Ms. Manco had full motor strength in all extremities. Ms. Manco's heel, toe, and tandem gait were normal and her sensation was intact. AR788. Ms. Manco's PHQ-9 score was 3. AR790. She had no barriers to learning. AR792.

**4.     Dakota Counseling Institute Records**

Ms. Manco was referred for counseling by her primary care physician and seen on June 10, 2015, by Patricia Fox, Ed.D., for depression, anxiety, and PTSD related to a kidnapping and sexual assault incident.  AR611.  She complained of symptoms of flashbacks, depression, anxiety, hypervigilance, exaggerated startle response, irritability, panic attacks, poor concentration, low self-esteem, inability to stay focused, and outbursts of anger.  AR611.

Ms. Manco reported that she had lost a job at a nursing home when a resident grabbed her arm, and she reacted by pushing him away.  AR611.  Ms. Manco's attention deficit hyperactivity disorder ("ADHD") assessment revealed 12 out of 18 positive answers for ADHD, her Beck Anxiety Inventory showed moderate anxiety, and her Beck Depression Inventory indicated severe depression.  AR611.  Ms. Manco was taking Vyvanse and Paxil. AR611.

Ms. Manco reported she had problems learning in school and attended special education classes through high school.  AR612.  She had been diagnosed with dyslexia when she was eight years old.  AR612.  Ms. Manco reported being married four times, physically abused by two of her husbands, and sexually abused by a neighbor when she was eleven years old. AR612.

Ms. Manco was observed to be in moderate distress and frequently looked to her daughter, who presented with her, to answer questions.  AR613.  She spoke rapidly, had good recall, normal attention and concentration, appeared to have fair to poor insight and judgment, and her mood was both anxious and dysphoric.  AR613.  She was diagnosed with major depressive recurrent

moderate, generalized anxiety disorder, sexual abuse of an adult, PTSD, partner relationship problems, and Cluster B traits with a Global Assessment of Functioning assessed at 50; she was scheduled for weekly counseling. AR613.

Ms. Manco was seen on June 24, 2015, to complete her intake that required more than one appointment due to Ms. Manco answering most of the intake questions with a story. AR614-15. Her thoughts were clear and coherent. Ms. Manco had no difficulty answering questions. AR615. Her intake was completed on June 24, 2015, where Dr. Fox noted she had clear and coherent thoughts. AR615. In addition, she was scheduled for counseling in a week; however, the next day Ms. Manco sought an emergency session and was seen. AR615-16. She presented with scattered thoughts, restricted affect, and an anxious and dysphoric mood. AR616. Ms. Manco had a disagreement with a woman she rented a room from due to some information the property owner received from Ms. Manco's soon-to-be ex-husband. The property owner's husband told Ms. Manco and the property owner that if they could not work things out, Ms. Manco would have to move. Ms. Manco was concerned she was going to lose her place to live. AR616. Dr. Fox noted Ms. Manco was able to ground herself through relaxation breathing and to develop a plan of action. AR616.

Ms. Manco was seen on July 13, 2015, and reported another altercation with the woman she rented a room from, and this time it had resulted in a physical altercation with the sheriff involved. AR726. Ms. Manco reported,

"When she returned Shelly [the property owner] started arguing and then shoved Carla who shoved her back." AR726. The sheriff "went looking" for the property owner, but the property owner was not charged with anything. AR726. She began looking for a different place to live and stayed with her son but reported she had problems sleeping for fear of the woman. AR726.

Ms. Manco was seen on July 16, 2015, for an intake appointment into the Care program. AR727. She identified needing help with keeping a job, not being too trusting, and help dealing with her past trauma. AR728. Ms. Manco told Dr. Fox that she had never been diagnosed with a developmental disability. AR729. She reported very few friends, but talked with her mother and children frequently. AR730. She asserted a dyslexia diagnosis when she was eight years old and said she attended special education classes. AR730. Dr. Fox described Ms. Manco as oriented; with good eye contact, average intelligence, and circumstantial but coherent thought process; poor insight and judgment especially in personal relationships; rapid, loud, and pressured speech, slightly restricted affect; anxious and dysphoric mood; and a moderately to severely distressed appearance. AR730.

Ms. Manco was seen for counseling on July 31, 2015, and again reported another confrontation, this time a verbal argument with a woman who lived next to her husband. Ms. Manco felt harassed and called the police. AR732.

Ms. Manco was seen for a Care appointment on August 7, 2015, and her affect was slightly restricted, her mood was anxious, and she reported losing her job at the convenience store because the owner told her that "others" were

not happy with her work.  AR733.  Ms. Manco applied for another job at a grocery store.  AR733. She was given information about DBT therapy group to help her manage her emotions.  AR733.

Ms. Manco was seen for a Care appointment on August 13, 2015, and her mood was anxious and slightly dysphoric.  She reported applying for work, but had failed to pass an assessment test required by Wal-Mart.  AR734.

Ms. Manco was seen for a Care appointment on August 20, 2015.  Her mood was euphoric, and she reported she had obtained a part-time job at a liquor store and was scheduled to start the next Monday, working 22 to 25 hours a week.  AR735.  Ms. Manco also reported that she was reconsidering whether to proceed with her divorce, at the request of her husband, and she felt much of the responsibility for the separation due to her irritability and crankiness.  AR735.  Ms. Manco reported that negative attitude had changed after she was put on medication.  AR735.

On August 26, 2015, Ms. Manco reported that she and her husband had gone out to eat several times.  AR736.  She reported keeping herself busy, being able to stay out of conflicts with others, and getting used to life without "drama."  AR736.

Ms. Manco was seen for a Care appointment on September 8, 2015, and she was cheerful and optimistic about the future and reported that she had applied to become a police officer in Mitchell.  AR737.  The record stated:

> The focus of today's session was to process her interval history.
> Carla reports that she and her husband Don have applied to
> become police officers in Mitchell.  She took one test and received a
> letter inviting her to take a more extensive test.  She also received

16

a notice from disability services to have a psychological evaluation later this week.  She talked about her concerns regarding the test and we spent some time discussing testing strategies.  She also expressed concern about her psychological evaluation but was able to dissipate her concerns before the end of the session.  She will see Brenda Davenport RN, CNP, for a psychiatric evaluation on 09/11/15.  Carla reports that she is getting along with other coworkers and with those who live in the same apartment complex.  She sees her husband, Don, frequently.  She states that they are communicating well and there has been no arguing as there was in the past.  Carla was given a bracelet with the saying "thoughts become things-choose the good ones."  This is to help her stay out of negativity.

Ms. Manco was seen by Brenda Davenport, RN, CNP, for a psychiatric evaluation on September 11, 2015, and reported she had been working with Dr. Fox for a few months to address mood and anxiety symptoms, but provided a very long and confusing history going into a significant discussion of her history of abuse.  AR738.  Ms. Manco reported she continues to have nightmares and that her abuser "John" is getting out of prison and "he always finds me."  AR738.  Ms. Manco said she enjoyed activities like spending time with her children and fishing with her husband.  She had feelings of hopelessness in the past but "not much now."  AR738.  Ms. Manco reported improved self-esteem and her energy level was better with the use of Vyvanse, and she said the Vyvanse helps to reduce her mind racing symptoms.  AR738.  Ms. Manco endorsed some level of psychomotor agitation and vague and passive history of suicidal thinking with no plan or intent.  AR738.  Her Beck Depression Inventory endorsed severe symptomatology, her Mood Disorder Questionnaire indicated a moderate problem, a bipolar diagnostic scale showed the upper end of low probability, and she had 4 of 10 affirmative criteria for

borderline personality disorder.  AR739.  Ms. Davenport said Ms. Manco did not demonstrate manic symptomatology but seemed influenced by an overly dramatic or emotional family.  AR739.  The mental status exam revealed no prominent deficits, but her differential diagnoses included major depressive disorder, recurrent, moderate with anxious distress; generalized anxiety disorder per history; probable lower level of intellectual functioning; and she was found to meet the criteria for SMI services.  AR742-43.  Ms. Davenport observed that Ms. Manco had good eye contact, appropriate grooming, and friendly mannerisms.  AR742.  Ms. Manco was attentive, had a normal gait, clear speech, and a fairly euthymic mood.  AR742.  She had logical thought process, average intellect, and appropriate judgment and insight.  AR742.

Dr. Fox saw Ms. Manco for a Care appointment on September 22, 2015, and her mood was slightly anxious but overall optimistic.  AR744.  She reported going to the emergency room because of boils on her abdomen, but was upset that the ER doctor did not think they needed treatment.  AR744.  Ms. Manco thought they could extend to her brain, so she was going to see her primary care doctor.  AR744.  Dr. Fox described her thoughts as clear and coherent and noted she was "doing very well both in her relationships and at work."  AR744.

Ms. Manco was seen for a Care appointment on November 9, 2015, and her affect was restricted and her mood was very anxious.  AR745.  She had seen her primary care doctor who did not think she had MRSA.  AR745.

Ms. Manco reported numerous worries and obsessing over the one-night affair her husband had while they were separated.  AR745.

Dr. Fox saw Ms. Manco for a Care appointment on March 4, 2016, and her thoughts were scattered, speech rapid, and mood anxious.  AR748. Dr. Fox noted that she was able to calm down by the end of the session. Ms. Manco had not seen Dr. Fox since November, 2015, and Ms. Manco did not offer a reason why she had not done so.  AR748.  She reported the anniversary of her kidnapping and rape was coming up and she was having nightmares and flashbacks.  AR748.  Ms. Manco reported being under a lot of stress at work because they were remodeling, and she could not find things.  AR748.  She reported that the woman her husband had an affair with while they were separated continued to harass them, and they filed a complaint with the police. AR748.

Ms. Manco saw Ms. Davenport for a psychiatric appointment on March 29, 2016, and her Paxil dosage was increased, however, Ms. Manco never took the increased dosage due to other medical problems.  AR750-51.  Ms. Manco had also missed appointments in November and December.  AR749. Ms. Manco reported having a lot more anxiety and nightmares.  AR749. Ms. Manco reported having a lot more flashback symptoms in the day and being able to reduce her symptoms "very quickly" with a tapping series or technique.  AR749. Ms. Manco reported having a lot of pain in her feet and some pain in her hands as well.  AR749.  Ms. Manco reported working two jobs:  one at a grocery store for 22-25 hours every two weeks and one in

securities where she was paid "under the table" three days a week. AR749. Ms. Davenport described Ms. Manco as alert and oriented, with clear speech, logical and goal-oriented thought processes, and appropriate insight and judgment. AR750. Her energy level was fair to good. AR750.

In May, 2016, Ms. Manco told Ms. Davenport that she rarely went to Florida, which she found stressful. She still engaged in her usual fun activities, went fishing with her husband, and had been bonding with her daughter. AR751. Ms. Davenport described Ms. Manco as pleasant, with fairly logical, goal-oriented thought processes and appropriate insight and judgment. AR751. Her energy level was "awesome." AR751.

Ms. Manco was seen for a Care appointment on May 20, 2016, and her affect was slightly restricted and her mood dysphoric. AR753. Ms. Manco reported visiting her sister in Florida for her nephew's graduation, but staying with her sister did not go well. She regretted going. AR753.

Ms. Manco saw Dr. Fox for a Care appointment on June 6, 2016, and her affect was restricted and her mood anxious and dysphoric. AR754. She reported losing her job due to an altercation with a coworker, but blamed her coworker who said she was very angry with her and shouted at her in front of customers, so she walked off the job. Despite calling her boss to explain why she was upset, he fired Ms. Manco the next day. AR754. Ms. Manco reported that she had lost other jobs in the past because of similar problems. AR754.

Ms. Manco was seen for a Care appointment on June 20, 2016, and her mood was slightly anxious, but also optimistic about the future. AR755. She had found a job as a taxi driver. AR755.

Ms. Manco saw Kari Rickel, CSW-PIP, for a Care intake appointment on August 1, 2016, and reported working at the American Legion as a bartender and waitress. AR757. She was observed to speak fast with elaborate answers and had some difficulty with focus and concentration, and it took her a half hour to fill out the questionnaire. AR759. Ms. Rickel also noted she appeared to be a good historian. AR759. Ms. Manco was found to continue to qualify for SMI services with a severe mental disability, markedly limited job skills and poor work history, and inability to procure appropriate support services without assistance. AR759.

Ms. Manco was seen for a Care appointment on August 3, 2016, and her thoughts were scattered and she was quite agitated with restricted affect and extremely anxious mood. AR761. She did not have money to pay for her medications because she lost her insurance because she had not paid her premiums, and she requested samples. AR761. She complained of not being able to concentrate and was not going to be able to do her job because of that. AR761. She was quite agitated and had called her doctor at home, but the doctor's wife would not let her speak to him. AR761.

Dr. Fox saw Ms. Manco for a Care appointment on August 8, 2016, and her thoughts were somewhat scattered, speech rapid, affect restricted and

mood anxious and agitated.  AR762.  She received assistance applying for the Medical Assistance for Workers with Disabilities program.  AR762.

Ms. Manco saw Ms. Davenport for a psychiatric appointment on August 10, 2016, and reported being out of Vyvanse for three days.  AR763.  She reported it had been causing her to be argumentative and agitated, and her husband had told her she was psychotic and had issues.  AR763.  She was working part-time at the American Legion.  She reported losing her job at Coborn's because a co-worker got in her face and made her angry.  AR763.  Her manager witnessed the altercation and also got in her face.  AR763.  Ms. Davenport stated that Ms. Manco had fairly logical and goal oriented thought processes and fairly appropriate judgment and insight.  Her energy level was fair to good and her gait was within normal limits.  AR764.  Ms. Davenport's plan for Ms. Manco included helping Ms. Manco understand her medical concerns "as she is lower functioning than she appears and is really struggling to understand her own medical needs at this point."  AR764.

Ms. Manco was seen for a Care appointment on August 24, 2016, and reported being scolded by her boss for failing to serve drinks to her customers.  She was angry about the criticism.  AR765.  Ms. Manco was able to process her thoughts with a guided imagery exercise.  AR765.

Ms. Manco saw Ms. Davenport for a psychiatric appointment on September 22, 2016, and reported she had been able to obtain Vyvanse through an assistance program.  She stated her mood and focus were much better, but she continued to be somewhat lower functioning.  AR766.

Ms. Davenport reported Ms. Manco had logical and goal oriented thought processes and fairly appropriate judgment and insight.  AR767.

Dr. Fox saw Ms. Manco for a Care appointment on October 13, 2016, and her affect was slightly restricted.  Her mood was anxious and dysphoric.  AR769.  She reported her manager fired her from her job at the American Legion.  AR769.  Her manager had many complaints about her, but she felt he treated her poorly.  AR769.  Ms. Manco acknowledged that she had lost a number of jobs in the past year and a half, and she blamed her managers rather than looking at her own behavior.  AR769.  Ms. Manco reported she continued to help her husband deliver newspapers and had a security job where she took money to the bank, but the next appointment said she only inserts ads into the papers.  AR769-70.  Dr. Fox could not discern why Ms. Manco stopped delivering the paper.  AR770.

Ms. Manco was seen for a psychiatric appointment on December 8, 2016, and reported concerns with other medical issues including falling a lot, increased muscle weakness in her legs, and new rash symptoms.  AR771.  Ms. Manco reported a rash on both sides of her face, but Ms. Davenport did not observe any rash symptoms on her face.  AR771.  Ms. Davenport stated that a well-known side effect of one of her medications was muscle weakness.  AR771.  She reported ongoing issues with memory and forgetfulness.  AR771.  Ms. Davenport's observations mirrored those on September 22, 2016.  AR771.

On January 24, 2017, Ms. Manco reported to Dr. Fox that she delivered papers early in the morning with her husband.  AR773.

On February 16, 2017, Ms. Manco told Ms. Davenport that she was doing "terrific" on Paxil and Vyvanse. AR774. Ms. Manco had high anxiety, which Ms. Davenport thought was a situational issue due to the pending release of a perpetrator who had assaulted her. AR774. Ms. Davenport stated, "Carla presents as just a little bit lower intellectual functioning to this provider and I have a hard time explaining things at times to her so she can understand them." AR774. Ms. Davenport described Ms. Manco as having logical thought processes and appropriate judgment and insight. AR774.

Ms. Davenport saw Ms. Manco for a psychiatric appointment on March 17, 2017, and reported an argument with her husband that resulted in both her and her husband being arrested. AR775. She reported being placed in jail, was very claustrophobic, and was not given her medications, but the treatment provider noted she was only in jail a little over two hours, so she was unsure what medications Ms. Manco was talking about. AR775. Ms. Manco reported she was still delivering newspapers. AR775.

On May 15, 2017, Ms. Manco told Ms. Davenport that she was still delivering newspapers, was not having any falls, and was getting along a little better with her husband. AR776. She did complain today her feet hurt and her legs were not working as well as they need to. AR776.

Dr. Fox, Ms. Manco's treating counselor, completed a medical source statement dated June 15, 2017, in which she gave her opinions as to Ms. Manco's ability to perform work-related activities on a full-time basis, eight hours per day, five days per week. AR810-12. Dr. Fox stated Ms. Manco

would have moderate limitations understanding and remembering simple instructions, carrying out simple instructions, and responding appropriately to usual work situations and changes in routine work settings. AR810-11. The form defined moderate to mean more than a slight limitation, but the individual is still able to function satisfactorily. AR810. Dr. Fox also identified areas of marked limitation where Ms. Manco would have a substantial loss in her ability to effectively perform the activity, including her ability to make judgments on simple work-related decisions; understanding and remembering, carrying out, or making judgments on complex instructions; and interacting appropriately with supervisors or co-workers. AR810-11. Dr. Fox explained that Ms. Manco had a learning disorder, was in special education, and often does not understand questions from her therapist or her doctor. AR811. Dr. Fox also stated that Ms. Manco does not maintain good boundaries with co-workers or supervisors, noting Ms. Manco is a very friendly woman who often misinterprets directions from supervisors. Dr. Fox wrote that Ms. Manco is compassionate, but often finds herself in the middle of "drama" in others' lives, and she gets extremely angry when confronted by co-workers and supervisors. AR811. Dr. Fox stated these limitations existed at least since June 2013 when she first met Ms. Manco. AR811.

### 5. Consultative Psychological Exam

Ms. Manco was sent for a consultative psychological exam with Galen Van Kley, Ph.D, a psychologist, on September 15, 2015. AR701. The exam consisted of a review of records, clinical interview, IQ testing, and memory

25

testing.  AR704.  Dr. Van Kley observed that Ms. Manco's speech was clear, but she conveyed information in a "markedly disorganized manner, often jumping from one topic to another and frequently becoming lost in irrelevant details. ..." AR704.  Dr. Van Kley found Ms. Manco was mildly anxious initially; her mood was cheerful for the most part with some momentary tearfulness when she talked about "people who want to mess with us."  AR704.  He also noted she became increasingly fidgety, but was able to focus and put forth an excellent effort during testing.  AR704.  Ms. Manco described herself as being "a people person" and also said she was leery of people, only interacts with her family, and felt better when she carries a gun.  AR706.

IQ testing revealed a FSIQ of 67 (first percentile rank), general ability of 69 (2nd percentile mark), verbal comprehension of 70 (2nd percentile mark), and auditory working memory of 69 (2nd percentile mark).  Dr. Van Kley stated Ms. Manco's overall performance indicated limited general intelligence with the Full Scale score in the extremely-low range.  AR707.  Dr. Van Kley stated that the memory tests showed that she would be able to retain information both visually and auditorily, but would benefit greatly from repetition.  AR708.

Ms. Manco reported that she is usually able to get along with other people, but has no friends outside her family, and Dr. Van Kley noted an altercation documented in the record between Ms. Manco and her landlord's wife, documentation of a tendency to become involved with drug addicts who mistreat her, and each of her four marriages had been "fraught with drama of some sort."  AR705.  Ms. Manco described numerous scenarios in which she

26

felt overwhelmed and Dr. Van Kley stated it "is important to note that she would be prone to react in a volatile manner in response to stress of any sort, having difficulty considering alternatives such as simply ignoring potentially confrontational situations." AR705. When asked about interacting with others Ms. Manco said she was a "people person" but added that since the kidnapping and assault in 2004, she is leery of people and is always looking over her shoulder, and "felt better when I could carry a gun." AR706. Ms. Manco stated she could become suddenly irritable and will snap at people with little provocation. AR706.

Dr. Van Kley diagnosed PTSD, ADHD, and borderline intellectual functioning. AR708. Dr. Van Kley concluded that Ms. Manco's attention-related problems were observed in the memory testing, and she might require additional time for learning. However, "others might become frustrated with her need for repetition, particularly given that her general presentation is that of an individual with average intelligence, which may contribute to employers becoming frustrated with her performance problems." AR709. Dr. Van Kley stated, "employment opportunities will be limited by her intellectual deficits" and "negative relationship patterns are also likely to continue as her intellectual limitations would make her a ready target for predatory individuals." AR710. Ms. Manco was capable of learning and retaining new information with repeated exposure. AR710. Dr. Van Kley noted that

Ms. Manco had responded favorably to psychotropic medication, and that she had worked for a single employer for five years following a traumatic event in 2004.  AR709.

### 6.    State Agency Assessments.

The State agency physician consultant at the initial level on November 16, 2015, found that Ms. Manco had no severe physical impairments, and non-severe hyperlipidemia and hypertension.  AR128.  The State agency physician consultant at the reconsideration level on February 11, 2016, made the same findings.  AR171.

The State agency psychological expert at the initial level on November 14, 2015, found severe mental impairments of affective disorder, anxiety disorder, and borderline intellectual functioning.  AR129.  The expert found that Ms. Manco had moderate difficulties maintaining social functioning, maintaining concentration, persistence or pace, and mild restrictions in her activities of daily living.  AR129.  The expert gave great weight to the opinions of Dr. Van Kley, the consultative examining psychologist.  AR131.  The expert asserted as part of her rationale Ms. Manco's ability to complete her disability forms appropriately.  AR131.  The expert asserted that Ms. Manco could only interact with others on a very limited and superficial basis, and perform routine tasks without supervision.  AR133.  The expert explained that the restriction to limited and superficial contact with others was based on Ms. Manco's past and current work history.  AR132.  The State agency expert at the reconsideration level made similar findings.  AR146.

**D.     Testimony at ALJ Hearing**

**1.     Ms. Manco's Testimony**

Ms. Manco testified that she graduated from high school, but was in special education classes in grade school, junior high and high school. AR91-92. She lived with her husband. AR89. She delivered newspapers with him and worked from 3:00 am until 6:30 am, Monday through Saturday. AR91-93. She had worked in a warehouse for a playing card manufacturer for five years, and quit work when she decided to change jobs. AR96-97.

Ms. Manco testified she could not follow instructions, she needed to ask for repeated explanations to understand, and she does not stay on task. AR110. She said she gets easily distracted, fidgety and frustrated, and gets angry with herself when she has a hard time doing what she is asked to do. AR110.

Ms. Manco testified that she was unable to pass her hairdresser test after multiple attempts, but did pass when someone read her the questions. AR107. She said she also had problems passing the written part of her driver's license exam and had to take it three or four times. AR107. Ms. Manco testified she sometimes had problems understanding the plot or story when watching TV. When she reads a book she does not do well and has to re-read it a couple of times. When taking tests she had missed sections of tests. AR876.

Ms. Manco testified she was right handed and had utilized a cane for about six months due to her neuropathy, her balance, and her legs and feet, which were not very strong. Ms. Manco said she had fallen a lot recently.

AR91.  She said she had talked to her neurologist, and using the cane was "our preference."  AR91.  Ms. Manco testified that her neuropathy made it difficult to stand or sit too long and after 30 minutes she starts to get fidgety.  AR98.

Ms. Manco testified that she takes medication for her pain that only helps a little, and she had discussed her pain with her neurologist who wanted to increase the dosage.  However, she had problems with dizziness and nausea with a higher dose.  AR101.  She testified she also takes Tylenol with codeine, could no longer take ibuprofen due to her kidneys, and used a heating pad and ice packs for her pain.  AR101-02.  Ms. Manco rated her average pain at a nine or ten, with ten being going to the emergency room because she was in so much pain.  AR100.  Ms. Manco stated she had been to the emergency room three times in the past year due to pain.  AR100.

Ms. Manco testified that from mid-arm to her fingers became tingly and numb.  AR102.  Ms. Manco testified that she had carpal tunnel surgery in both hands three years prior, but still has numbness and tingling in both hands, worse on the left.  AR108.  She said she had problems grasping and holding things, worse on the left and had problems with things like buttons.  AR108-09.  Ms. Manco said she could reach into the refrigerator and lift a gallon of milk with her right hand, but not her left.  AR109.

The ALJ noted in the hearing that Ms. Manco had held a lot of jobs over the years and asked Ms. Manco why.  AR94.  Ms. Manco testified she got fired a lot because she had issues with her co-workers and supervisors.  AR94.  She said she always had issues, but it got worse after she was raped.  AR94-95.

Ms. Manco testified that she was fired from Fire Steel as a CNA for an incident with a resident and was also fired from the Aurora nursing home for an incident yelling back and forth with a co-worker in a resident hall.  AR97, 109.

When asked about her typical day, Ms. Manco testified her sleep was "on and off" and she had a lot of nightmares related to her rape, she said "I can tell you the whole thing in my subconscious.  It's like it just happened."  AR876. She said she shops with her husband usually later when it's less crowded, her husband does the lifting, and she holds onto the cart, but her cane is with her at all times.  AR877.

### 2.    Vocational Expert Testimony

The ALJ asked the vocational expert ("VE") to identify the work Ms. Manco performed as a "line worker" and the VE stated the job was hand packager, Dictionary of Occupational Titles ("DOT") #920.587-018 (4th ed. 1991).  The VE testified the job was medium exertion in the DOT, but he believed, based on Ms. Manco's testimony, that she performed it at light exertion.

The ALJ then asked a hypothetical question to the VE:

> assume a hypothetical individual of Ms. Manco's age, education with the past work experience that you previously described.  Ask you to further assume that that individual's limited, by her medically determinable impairments to medium work, lifting and carrying 50 pounds occasionally, 25 pounds frequently, sit, standing, and walking up to six hours in an eight hour day, and pushing and pulling as much as lifting and carrying.  That individual would be limited to frequent climbing of ramps and stairs, occasional climbing of ladders or scaffolds, as well as, frequent balancing, stooping, kneeling, crouching, and crawling.

> The individual would be further limited to frequent bilateral
> handling, fingering, and feeling, and occasional exposure to
> unprotected heights and moving mechanical parts. Finally, the
> individual would be limited to simple work-related decisions, and
> occasional interaction with supervisors, co-workers, and the
> general public.

AR114-15. The VE testified that the occupation of hand packager would be available to such an individual. AR115.

The VE testified that if an individual was unable to have any interaction with supervisors or co-workers they would not be employable. AR118. The VE also testified that an individual would be unemployable if they were off task more than 10% of the day or missed more than two days of work per month. AR118. The VE testified that his testimony was consistent with the DOT. AR118.

**E.      Other Evidence**

SSA asked Ms. Manco to complete a work activity report for work since April, 2013, and identified four jobs on the form. AR353. Ms. Manco responded that her full time jobs all ended due to her medical condition in 90 days or less, except Wal-Mart. AR359. She stated she was fired from three of the jobs listed and was told if she did not quit she would be fired from the fourth because she could not do the job because of her depression and learning disability. AR359. The State agency found these to be unsuccessful work attempts. AR366. In another work activity form, she identified being fired from Coburn's Inc. AR435.

When asked to complete a disability report, another person was identified as the person completing the form for Ms. Manco. AR372. When

completing a function report, Ms. Manco stated she had been fired for fighting with other people and listed two different employers. AR395. Ms. Manco was asked to complete a form on her medications prior to the hearing and identified medications included gabapentin for neuropathy. AR433.

**F.      Disputed Facts**

The following facts were proposed by the Plaintiff and objected to by the Defendant:

1.      The ALJ also found that Ms. Manco had medically determinable impairments of hypertension, hyperlipidemia, right carpal tunnel release, obesity, right renal cyst, gastroesophageal reflux disease, and sleep apnea, but determined they were all non-severe. AR12. (The court notes the Commissioner agreed to statement of fact no. 6, which is virtually identical to this disputed fact).

2.      The ALJ considered the opinions of the State agency medical consultants who found that Ms. Manco did not have a severe impairment and did not provide a physical RFC assessment and gave them "only some weight." AR19.

3.      The ALJ noted in the decision that Ms. Manco's treating physician, Dr. Olegario, limited her to lifting no greater than 10 pounds in July, 2014, but failed to say what if any weight he gave the opinion. AR16.

**DISCUSSION**

## A.    Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); <u>Minor v. Astrue</u>, 574 F.3d 625, 627 (8th Cir. 2009).  Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Klug v. Weinberger</u>, 514 F.2d 423, 425 (8th Cir. 1975).  "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action." <u>Scott ex rel. Scott v. Astrue</u>, 529 F.3d 818, 821 (8th Cir. 2008) (internal punctuation altered, citations omitted).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. <u>Minor</u>, 574 F.3d at 627.   The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision.  <u>Woolf v. Shalala</u> 3 F.3d 1210, 1213 (8th Cir. 1993); <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005).  If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed.  <u>Oberst v. Shalala</u>, 2 F.3d 249, 250 (8th Cir. 1993).  "In short, a reviewing court should

neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith, 982 F.2d at 311.

**B.    The Disability Determination and the Five-Step Procedure**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R.

§ 404.1520.  If the determination that an applicant is disabled can definitively be made at any step, evaluation under a subsequent step is unnecessary. Bartlett v. Heckler, 777 F.2d 1318, 1319 (8th Cir. 1985).  The five steps are as follows:

**Step One**:  Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

**Step Two**: Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe.  Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a.  This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three**: Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404.  20 C.F.R. § 404.1520(d).  If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry.  Bartlett 777 F.2d at 1320, n.2.  This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460, (1983).  If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four.  NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing.  20 C.F.R. § 1520a(c)(2).

**Step Four**: Determine whether the applicant is capable of performing past relevant work (PRW).  To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC).  If the applicant's

RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five**: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 1520(f).

## C.    Burden of Proof

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry. Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at step five. "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting is "a long standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart 377 F.3d 801, 806 (8th Cir. 2004).

## D.    The Parties' Positions

Ms. Manco asserts the Commissioner erred by finding her not disabled within the meaning of the Social Security Act. She asserts the Commissioner erred in two ways: (1) The commissioners determination of her RFC was not

supported by substantial evidence;[4] and (2) The commissioner's Step 4 finding that she could perform her past relevant work as a hand packager was not supported by substantial evidence. The Commissioner asserts the denial of disability benefits for Ms. Manco is supported by substantial evidence on the record as a whole and the decision should be affirmed.

## E.    Analysis

Ms. Manco's arguments are addressed in turn below:

### 1.    Whether the Commissioner's Determination of Ms. Manco's RFC is Supported by Substantial Evidence

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered). "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability. 20 C.F.R. § 404.1545(b)." Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013). The formulation of the RFC has been described as "probably the most important issue" in a Social Security case. McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982), abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all a claimant's mental and physical impairments in combination, including those impairments

---

[4] In Ms. Manco's brief, this issue is broken into two sub-issues: (a) the Commissioner failed to fairly and fully develop the record; and (b) the Commissioner failed to properly determine the limitations presented by Ms. Manco's mental impairments.

that are severe and those that are nonsevere.  <u>Lauer</u>, 245 F.3d at 703; Social

Security Ruling (SSR) 96-8p 1996 WL 374184 (July 2, 1996).  Although the

ALJ "bears the primary responsibility for assessing a claimant's residual

functional capacity based on *all* the relevant evidence . . . a claimant's residual

functional capacity is a medical question."[5]  <u>Lauer</u>, 245 F.3d at 703 (citations

omitted) (emphasis added).  Therefore, "[s]ome medical evidence must support

the determination of the claimant's RFC, and the ALJ should obtain medical

evidence that addresses the claimant's ability to function in the workplace."  <u>Id.</u>

(citations omitted).

 "The RFC assessment must always consider and address medical source

opinions."  SSR 96-8p.  If the ALJ's assessment of RFC conflicts with the

opinion of a medical source, the ALJ "must explain why the [medical source]

opinion was not adopted."  <u>Id.</u>  "Medical opinions from treating sources about

the nature and severity of an individual's impairment(s) are entitled to special

significance and may be entitled to controlling weight.  If a treating source's

medical opinion on an issue of the nature and severity of an individual's

impairment(s) is well-supported by medically acceptable clinical and laboratory

---

[5] Relevant evidence includes:  medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations.  <u>See</u> SSR 96-8p.

diagnostic techniques and is not inconsistent with the other substantial

evidence in the case record, the [ALJ] must give it controlling weight." Id.

Ultimate issues such as RFC, "disabled," or "unable to work" are issues

reserved to the ALJ. Id. at n.8. Medical source opinions on these ultimate

issues must still be considered by the ALJ in making these determinations. Id.

However, the ALJ is not required to give such opinions special significance

because they were rendered by a treating medical source. Id.

"Where there is no allegation of a physical or mental limitation or

restriction of a specific functional capacity, and no information in the case

record that there is such a limitation or restriction, the adjudicator must

consider the individual to have no limitation or restriction with respect to that

functional capacity." SSR 96-8p. However, the ALJ "must make every

reasonable effort to ensure that the file contains sufficient evidence to assess

RFC." Id.

When writing its opinion, the ALJ "must include a narrative discussion

describing how the evidence supports each conclusion, citing specific medical

facts . . . and nonmedical evidence. . . In assessing RFC, the adjudicator must

. . . explain how any material inconsistencies or ambiguities in the evidence in

the case record were considered and resolved." Id.

Finally, "[T]o find that a claimant has the [RFC] to perform a certain type

of work, the claimant must have the ability to perform the requisite acts day in

and day out, in the sometimes competitive and stressful conditions in which

real people work in the real world." Reed, 399 F.3d at 923 (citations omitted,

punctuation altered); SSR 96-8p 1996 WL 374184 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule."). Ms. Manco's two objections are discussed below.

### a. Whether the Commissioner Fully and Fairly Developed the Record

Ms. Manco asserts the ALJ failed to fully and fairly develop the record because the ALJ conceded that at the time the State agency experts submitted their opinions, there were no medical records available which established or addressed the potential limitations presented by two of the physical impairments the ALJ ultimately accepted as severe (neuropathy and cervical degenerative disc disease). The ALJ therefore gave the State agency physician opinions only "some" weight. AR19.

Ms. Manco's claim was initially denied in November, 2015. AR128. At that time, Dr. Kevin Whittle reviewed Ms. Manco's claim on behalf of the State agency and indicated in his report that all of Ms. Manco's limitations were mental or psychological in nature, and there were "no physical impairments noted." Id.

Ms. Manco's claim was denied on reconsideration in February, 2016. AR171. At that time, Dr. David Rossing reviewed her file on behalf of the State agency. Id. Dr. Rossing noted Ms. Manco's high cholesterol, her assertion that she had been diagnosed with MRSA, and her high blood pressure. Id.

Dr. Rossing, however, noted that though Ms. Manco had visited the ER with acute musculoskeletal complaints and had undergone right carpal tunnel release, "the records do not reveal a severe physical impairment." Id.

There was one physician of record (Ms. Manco's treating neurologist, Dr. Olegario), who imposed any sort of physical restriction upon Ms. Manco in association with her upper extremity. This occurred in July, 2014. AR579. Dr. Olegario imposed a ten-pound lifting restriction "for now" but did not state what "for now" meant in terms of a time limit. Id. The context for this restriction was Ms. Manco's office visit complaining of low back pain and pain between her shoulder blades. AR577. Dr. Olegario noted that, at that time, Ms. Manco had "no known history of any concerning spinal abnormalities." Id. Dr. Olegario attributed Ms. Manco's complaints to musculoskeletal discomfort. AR579.

Ms. Manco's cervical disc disease was not diagnosed until July, 2016, when in response to Ms. Manco's complaints to Dr. Olegario of limb numbness and hyperreflexia[6] Dr. Olegario ordered an MRI of her cervical spine. AR806. The MRI showed a small central disc protrusion at C4-5 without central disc protrusion, a small central and right paracentral disc protrusion at C5-6 without spinal stenosis or spinal cord compression; and a moderate sized broad-based posterior disc bulge which effaces the ventral thecal sac without

---

[6] Hyperreflexia is hyperreflexia [hi″per-re-flek´se-ah] is the exaggeration of reflexes, sometimes due to excessive activity of the sympathetic nervous system; see also autonomic dysreflexia. Miller-Keane Encyclopedia and Dictionary of Medicine, Nursing, and Allied Health, Seventh Edition. (2003).

cord compression at C6-7.  Id.  The radiologist who read this MRI indicated

Ms. Manco had degenerative disc disease of the cervical spine without

significant spinal stenosis or spinal cord compression.  Id.  Neither at this time

nor any other was Dr. Olegario asked whether physical limitations were

appropriate or necessary because of Ms. Manco's cervical disc disease

diagnosis.

The other severe impairment which was not included in the record when

the State agency physicians rendered their opinions is Ms. Manco's small fiber

neuropathy.  This impairment was diagnosed in April, 2016.  AR836.  This

diagnosis arose when Ms. Manco visited Dr. Olegario complaining of numbness

and tingling in her feet and hands.  Id.; AR793.  After Dr. Olegario had ordered

and reviewed several tests to determine the cause of Ms. Manco's symptoms,

Dr. Olegario/Dr. Karen Garnaas surmised the most likely cause was small fiber

neuropathy.[7]   Again, it does not appear that Dr. Olegario, Dr. Garnaas, or any

---

[7] Small fiber neuropathy occurs when the small fibers of the peripheral nervous system are damaged. Small fibers in the skin relay sensory information about pain and temperature. In the organs, these small fibers regulate automatic functions such as heart rate and breathing.  A diagnosis of small fiber neuropathy can be a sign of an underlying health condition, such as diabetes. Often, though, no underlying cause is identified.  This condition causes sensory symptoms such as pain, burning, and tingling. These symptoms often start in the feet and progress up the rest of the body. They may become more severe over time.  Small fiber neuropathy is a type of peripheral neuropathy. Peripheral neuropathies affect the peripheral nervous system. This includes the nerves outside of the brain and spinal cord. With small fiber neuropathy, the narrow nerve fibers of the peripheral nervous system are affected.

Symptoms of small fiber neuropathy can vary. Pain is the most common symptom. Other symptoms include sensations, such as: burning, tingling, or prickling (paresthesia); short bursts of pain; or loss of sensation. Some sensory symptoms can be caused by external triggers. For instance, some people might

other physician of record was ever asked whether any physical limitations were appropriate or necessary as a result of Ms. Manco's small fiber neuropathy diagnosis.

Ms. Manco asserts the ALJ did not include in its RFC formulation any explanation about what, if any limitations were included to account for these two severe impairments. She further argues none are apparent because the ALJ indicated Ms. Manco was capable of medium work—in other words lifting 50 pounds occasionally (one-third of the workday) and 25 pounds frequently (two-thirds of the workday). Also, the ALJ assigned no manipulative or reaching limitations. See AR14 (description of the RFC as determined by the ALJ). Ms. Manco argues the manipulative limitations are especially important in her case, because the occupation the VE found she can perform (hand packager) requires constant reaching, handling and fingering. See DOT # 920.587-018 (hand packager).

The duty of the ALJ to develop the record—with or without counsel representing the claimant--is a widely recognized rule of long standing in social security cases:

> Normally in Anglo-American legal practice, courts rely on the rigors of the adversarial process to reveal the true facts of the case. However, social security hearings are non-adversarial. Well-settled precedent confirms that the ALJ bears a responsibility to develop

---

experience foot pain when wearing socks or touching bedsheets. Symptoms can be mild or severe, though early symptoms are often mild. Small fiber neuropathy tends to affect the feet first and progress upward. This is known as a "stocking-and-glove" distribution. At later stages, this condition may affect the hands. See https://www.healthline.com/health/small-fiber-neuropathy#diagnosis (all internet citations in in this opinion were last checked April 5, 2019).

the record fairly and fully, independent of the claimant's burden to press his case. The ALJ's duty to develop the record extends even to cases like Snead's, where an attorney represented the claimant at the administrative hearing. The ALJ possesses no interest in denying benefits and must act neutrally in developing the record.

Snead v. Barnhart, 360 F.3d 834, 838 (8th 2004) (citations omitted). See also Johnson v. Astrue, 627 F.3d 316, 319-20 (8th Cir. 2010) (ALJ has a duty to develop the record even when claimant has counsel). If the record is insufficient to determine whether the claimant is disabled, the ALJ must develop the record by seeking additional evidence or clarification. McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011). However, this is true only for "crucial" issues. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).

Ms. Manco asserts the ALJ's RFC is not properly supported because the ALJ formulated a functional capacity that was not supported by any medical opinion; instead the ALJ improperly substituted its own opinions for those of the medical experts. While it is true that the ALJ is free to formulate the RFC from all the evidence including the opinion evidence and the medical records, it is also established law that the ALJ may not substitute its own opinions for those of the physician. Finch v. Astrue, 547 F.3d 933, 938 (8th Cir. 2008), nor may the ALJ "play doctor" or rely on its own interpretation of the meaning of the medical records. Pate-Fires v. Astrue, 564 F.3d 935, 946-47 (8th Cir. 2009). These principles were recently reaffirmed in Combs v. Berryhill, 878 F.3d 642, 647 (8th Cir. 2017).

Additionally, SSR 96-8p instructs ALJs how to determine RFC and how to explain their determinations. That ruling contains requirements for the

ALJ's narrative discussion. One of those requirements is that the RFC assessment must "include a resolution of any inconsistencies in the evidence as a whole . . ." Id. at p. 13. Another is that "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." Id. at p. 14.

Here, the crucial restriction which was not addressed by the State agency physicians was Ms. Manco's upper extremity functional limitations. The ALJ's RFC limited Ms. Manco to lifting 50 pounds occasionally and 25 pounds frequently, but imposed no manipulative limitations upon reaching, handling, or fingering. AR14. Further, the ALJ limited Ms. Manco in pushing or pulling only as to the same weight restrictions as lifting and carrying (50 and 25 pounds). Id.

The Commissioner argues the ALJ properly imposed its own upper extremity physical restrictions because Ms. Manco failed to prove that any other or different restrictions were necessitated by her severe impairments. The Commissioner also argues that just because Ms. Manco had severe impairments of degenerative disc disease of the cervical spine and small fiber neuropathy does not necessarily mean that she had any corresponding physical limitations associated with those two severe impairments which more than minimally limited her ability to work.

The ALJ specifically rejected the State agency physicians' opinions that Ms. Manco had no physical impairments. But because the RFC is a crucial

issue, the ALJ was obligated to further develop the record to obtain a medical opinion, whether through a consultative exam or from Ms. Manco's treating physicians, regarding what if any physical limitations were presented by the severe impairments that were not present when the State agency physicians reviewed Ms. Manco's file.

Instead of doing this, the ALJ imposed its own upper extremity functional limitation of occasionally lifting 50 pounds frequently lifting 25 pounds and similar push/pull restrictions, plus unlimited reaching limitations. The ALJ reached this RFC <u>not</u> by resolving the conflict among the experts (as no physician imposed those limitations) but instead by reviewing medical records which showed normal upper extremity strength, and by drawing its own conclusion that this medical finding equated to a finding that there was no objective reason for Ms. Manco's complaints. The ALJ, however, may not substitute its own opinion for that of the physicians, and may not draw its own inferences as to the relevance of the medical records. <u>Combs</u>, 878 F.3d 647; <u>Strongson v. Barnhart</u>, 361 F.3d 1066, 1070 (8th Cir. 2004) (the ALJ "may not simply draw his own inferences about plaintiff's functional ability from medical reports.").

In her brief, Ms. Manco cites <u>Combs</u> for the proposition that it was improper for the ALJ to substitute its own opinions for those of a physician and to make its own inferences regarding the meaning of physicians' notes regarding their relevance to her ability to function in the workplace, rather than further developing the record.  The Commissioner cites <u>Fentress v.</u>

Berryhill, 854 F.3d 1016, 1020 (8th Cir. 2017); Anderson v. Berryhill, 2018 WL

3845958 (D. Minn., Aug. 13, 2018) and Gordon v. Colvin, 2014 WL 4261628

(N.D. Iowa, Aug. 27, 2014) for the  proposition that it is perfectly acceptable to

allow the ALJ to interpret on its own notations in the medical records such as

"full strength," "minimally abnormal," or "full range of motion" when

formulating the claimant's RFC, and that to do otherwise would nullify the role

of the ALJ in formulating the RFC.

In Combs, the claimant sought judicial review of the Commissioner's

denial of benefits.  Combs, 878 F.3d at 643.  She alleged disability based upon

the combined effects of rheumatoid arthritis, osteoarthritis, asthma, and

obesity.  Id.  The district court affirmed the ALJ's denial of her application for

disability.  Id.  The Eighth Circuit reversed, concluding the ALJ had failed to

fully and fairly develop the record.  Id.

At the hearing level of the administrative proceedings, Ms. Combs

presented medical records containing treatment notes spanning the relevant

time frame.  Id. at 644.  Some of those records indicated she was in "no acute

distress" and that she showed "normal movement of all extremities."  Id.  None

of the physicians who made these notes, however, ultimately offered an opinion

about Ms. Combs' physical functional abilities.  Id.  Instead, the only physician

opinions from which the ALJ had to choose when the time came to formulate

Ms. Combs' RFC were State agency physicians who had never treated or

examined Ms. Combs.  Id.

One of the State agency physicians opined Ms. Combs was capable of only sedentary work; the other opined she could work at the light duty level. Id. at pp. 644-45. The ALJ credited the opinion of the State agency physician who opined Ms. Combs could work at the light duty level. Id. at 645. In doing so, the ALJ found Ms. Combs' subjective complaints "not entirely credible" and rated the second State agency physician's opinions as more consistent with the record as a whole. Id. The ALJ made these findings by interpreting the notations in Ms. Combs' medical records—specifically finding that she was in "no acute distress" and had "normal movement of all extremities" to be more consistent with light duty abilities. Id. Ms. Combs asserted the ALJ committed error, because the ALJ gave greater weight to the second State agency physician by relying on the ALJ's own inference of the meaning of "no acute distress" and "normal movement of all extremities" rather than contacting her medical providers for clarification as to how those notations affected her physical abilities. Id. at 646. The court agreed.

The court began by acknowledging the ALJ's responsibility to develop the record fully and fairly, independent of the claimant's burden to press her own case. Id. at 646-47 (citing Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010)). The ALJ does not have to seek clarifying statements from a treating physician unless a crucial issue is underdeveloped. Id. (citing Vossen, 612 F.3d at 1016). But the ALJ is prohibited from substituting his own opinion for those of the physician. Id. (citing Finch, 547 F.3d at 938).

The court concluded the ALJ erred by relying on its own inferences as to the relevance of the notations "no acute distress" and "normal movements of all extremities" when deciding the relative weight to assign to the State agency physician opinions. Combs, 878 F.3d at 647. The Commissioner in brief conceded that "no acute distress" was not particularly significant with regard to Ms. Combs' conditions but argued that "normal movements of all extremities" was inconsistent with Ms. Combs' pain complaints—and that this was an interpretation the ALJ should have been allowed to make. Id. at 647. But the court disagreed and found the relevance of this medical note in terms of Ms. Combs ability to function in the workplace *was not clear.* Id. Though the notation was consistently made in the medical records, her medical providers at the same time consistently diagnosed her with rheumatoid arthritis, prescribed medications for severe pain, and noted her pain that was associated with the normal range of motion. Id. Therefore, the court noted, by relying on its own interpretation of the phrases "no acute distress" and "normal movement of all extremities" as to its relevance to Ms. Combs' RFC, the ALJ failed to satisfy its duty to fully and fairly develop the record. Id. (citing Byes v. Astrue, 687 F.3d 913, 915-16 (8th Cir. 2012) ("Failing to develop the record is reversible error when it does not contain enough evidence to determine the impact of a claimant's impairment on her ability to work.")). The court instructed that remand was necessary so the ALJ could inquire as to the relevance of the entries in Ms. Combs' treating physicians' records upon her ability to function in the workplace. Combs, 878 F.3d at 647.

In Fentress, 854 F.3d 1016, the claimant sought judicial review of the Commissioner's partial denial of social security benefits. Id. at 1018. In Fentress, the claimant received benefits for a period beginning in 2012, but the Commissioner found Mr. Fentress was not disabled before August, 2012 and denied his claim for benefits before that date. Id.

On appeal to the Eighth Circuit, Mr. Fentress asserted the ALJ erred by finding him not disabled before August, 2012 because the ALJ discounted the opinion of a physician who had been treating him for two months. Id. at 1020. The physician opined Mr. Fentress was "unable to perform sustained employment" due to pain and fatigue. Id.

The ALJ found this medical opinion inconsistent with the other, substantial evidence in the record. Id. The "other" record evidence cited by the ALJ was: (1) physical examinations during the same time period which showed normal muscle strength, range of motion, and no pain or weakness in extremities, as well as Mr. Fentress's own contemporaneous reports denying problems with standing, walking, vision, weakness, dizziness, pain, or loss of motor skills; (2) the opinion of another physician, who found after examination that Mr. Fentress's extremities, strength, gait, and limb functions were normal and unimpaired; (3) diagnostic test results which showed Mr. Fentress's symptoms were well-controlled when he abstained from illegal drug use and was compliant with treatment recommendations; and (4) Mr. Fentress's daily activities, which included fishing and dog training.

The court, considering all these factors cited by the ALJ in deciding to reject the opinion of Dr. Fentress's treating physician, found the ALJ had not erred. Id. at 1021. This was so, the court explained, because the ALJ had reviewed the entire record, including the objective records, Mr. Fentress's pain complaints, and the opinion evidence. Id. After doing so, the ALJ did not wholesale adopt one opinion or another, but instead performed its duty to ferret out only the credible limitations: "[i]t is the function of the Commissioner to weigh conflicting evidence and to resolve disagreements among physicians." Id. (citing Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007)).

The Commissioner also cites Gordon v. Colvin, 2014 WL 4261628 at* 1 (N.D. Iowa, Aug. 27, 2014) in support of its position. In Gordon, the claimant appealed the Commissioner's denial of SSI benefits. Id. In her case, several physicians had offered their opinions as to her functional physical and mental abilities. Id. at * 4-5. Additionally, the ALJ ordered a consultative examination. Id. The ALJ adopted the opinion of a non-examining, non-treating State agency physician over the opinion of the consulting physician. Id. at *7. In affirming the ALJ's decision, the district court cited the consulting physician's opinion, which noted Ms. Gordon's grip strength was strong and equal and that her range of motion was normal in her upper extremity. Id. at *8. Therefore, the court concluded, the ALJ did not err by affording the State agency physician more weight than the consulting physician. Id. at *9. Additionally, the court noted, other factors considered by the ALJ were the observations of treating physicians and Ms. Gordon's own description of her

limitations.  Id.  The court specifically found, therefore, that the ALJ's decision was based upon a fully and fairly developed record.  Id.

The final case cited by the Commissioner for the proposition that the ALJ properly developed the record is Anderson v. Berryhill, 2018 WL 3845958 at *5 (D. Minn., Aug. 13, 2018).  In that case, the ALJ denied the claimant's disability claim which was based upon allegations of head trauma, bulging discs in her neck and back, and pain in her left leg.  Id. at * 1.  The ALJ determined Ms. Anderson had several severe impairments but none that met a Listing, that she had the RFC to perform light work, and that she could return to her past relevant work.  Id. at **3-4.  On appeal, Ms. Anderson asserted the ALJ improperly determined her RFC, improperly determined her impairments did not meet a Listing, and impermissibly discounted her subjective complaints.  Id. at *4.

Addressing the RFC determination, the court found the ALJ's analysis was supported by substantial evidence.  Id.  This finding was based upon the ALJ's observation that Ms. Anderson had been capable of light duty work before her back surgery, and nothing in the postoperative recovery suggested she had been assigned any additional physical limitations.  Id.  In fact, Ms. Anderson told her pre-operative physical therapist that she was "looking for a cleaning job" and that she walked, biked, and attended water aerobics. Id.  The record also revealed Ms. Anderson met all her therapy goals and was discharged from therapy.  Post-operatively, Ms. Anderson's surgeon remarked that she was doing very well and referred to her progress "remarkable."

Id. at *4.  Her surgeon categorized Ms. Anderson's pain as "low intensity" and placed her on no pain medication.  Id.  He expected her to undergo physical therapy and re-evaluate her in six weeks.  Id.  Given this evidence, the court found the ALJ did not err by concluding Ms. Anderson's capabilities did not change from her pre-operative state.  Id.

As for the ALJ's determination that Ms. Anderson's impairments did not meet or equal a Listing level impairment, the court concluded the ALJ did not err in this portion of the decision either.  Id. at *5.  The court acknowledged that in this portion of its decision, the ALJ's decision-writing technique lacked clarity because there were not specific references to the medical record.  Id. [8] But because the court found the ALJ *had* cited the necessary specific medical records (for example, that Ms. Anderson had 5/5 strength and negative straight leg raises) when discussing Ms. Anderson's RFC, that was enough for purposes of determining that her impairments did not meet or equal a Listing. Id.

---

[8] As briefly mentioned in Section B above, at Step 3 of the sequential analysis, if a claimant is determined to have a Listing level impairment, he or she is presumed to be disabled without proceeding to the remaining steps of the analysis.  To determine whether a claimant has an impairment which is Listing level, there are several very specific and defined requirements which must be met, and which are spelled out in the Listings themselves.  The Listings define the symptoms that must be present and usually the objective medical test which must confirm the diagnosis.  For example, for Listing 1.04 (disorders of the spine) one of the possible impairments is (C) lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

It is this portion of the <u>Anderson</u> decision that is cited by the Commissioner for the proposition that an ALJ may self-interpret findings in the medical record such as "5/5 strength" or "minimally abnormal" in support of his RFC formulation. <u>See</u> Commissioner's brief, Docket 23 at pp. 9-10. While the <u>Anderson</u> court noted the ALJ's observation of these findings was found in its RFC formulation, it cited with approval the ALJ's citation to such findings to conclude that the ALJ had properly analyzed whether the claimant's impairments did or did not meet the Listing requirements—a completely different inquiry within the five-step sequential analysis. <u>Anderson</u>, 2018 WL 3845958 at *5.

This court has carefully reviewed the cases cited by both parties and the record in this case. <u>Combs</u> is outcome-determinative here. In this case, the ALJ had no physician opinions upon which to base the RFC determination as to Ms. Manco's physical limitations other than the temporary limitation placed by Dr. Olegario in 2014. Not a single physician had been asked to offer such an opinion after the time Ms. Manco was diagnosed with the two physical impairments (degenerative cervical disc disease and small fiber neuropathy) which the ALJ found to be severe. Rather than seeking a medical opinion about what, if any, physical limitations were appropriate for Ms. Manco based upon those or any other of her severe impairments, the ALJ drew its own inferences about that issue by interpreting the medical records. This the ALJ is prohibited from doing. <u>Combs</u>, 878 F.3d at 646; <u>Strongson</u>, 361 F.3d at 1070. Though the RFC is a question for the ALJ to determine, it must be

based on "some medical evidence of the claimant's ability to function in the workplace." Combs, 878 F.3d at 646 (cleaned up). And because the RFC is a crucial issue which was undeveloped, remand is required to determine what, if any, physical restrictions are appropriate for Ms. Manco's physical impairments. On remand, the ALJ is instructed to obtain and give proper weight to medical opinions regarding this issue and refrain from substituting its own opinions for the medical opinions as to Ms. Manco's RFC.

> **b. Whether the Commissioner Properly Determined the Limitations Presented by Ms. Manco's Mental Impairments**

Ms. Manco's next assignment of error asserts the ALJ failed to properly determine the limitations presented by her mental impairments. Specifically, the ALJ found Ms. Manco had several severe mental impairments, including PTSD because of being kidnapped and raped, attention deficit hyperactivity disorder, dyslexia, anxiety, and depression. AR12. The ALJ also found Ms. Manco has a severe mental impairment of borderline intellectual functioning, with an IQ of 67. AR12, 706.

Ms. Manco asserts that at the time she filed her claim, this level of IQ in combination with another severe impairment would likely have been considered a Listing level intellectual impairment under Listing 12.05C in effect as of the date of her application (June, 2015). By the time her case was decided,

however (January, 2017) she asserts the version of the Listing which was in effect and which was applied to her claim was more difficult to meet.[9]

Ms. Manco also asserts the ALJ "fell prey" to the very problem noted by the consultative psychological examiner, Dr. Van Kley. That is, Ms. Manco's general presentation is that of a person of average intelligence which leads people--including her work supervisors--to have higher expectations of her than she can achieve. This in turn ultimately leads to frustration and problems when Ms. Manco does not or cannot live up to those expectations. See AR709.

Ms. Manco's primary arguments regarding the ALJ's evaluation of her mental impairments, however, are that: (1) the ALJ gave only lip-service to the expert opinion which it claimed to adopt by misstating the mental restrictions imposed by the State agency physicians whose opinions it purported to give great weight in the RFC; and (2) the ALJ did not give appropriate weight to the medical opinions in the record regarding Ms. Manco's mental limitations. These two arguments, which the court understands to be at the core of Ms. Manco's assignment of error, are discussed below.

The court first addresses Ms. Manco's assertion that the ALJ mischaracterized the restrictions imposed by the State agency physicians, whose opinions it purported to give "great weight" when formulating the RFC. See AR19 (explaining the State agency psychological consultant assessments

---

[9] The court does not discuss this portion of Ms. Manco's argument in detail, because Ms. Manco does not claim the ALJ erred by failing to find any of her mental impairments met or equaled a Listing.

were considered and given "great weight."). The ALJ concluded the State agency consultants determined Ms. Manco had the ability to understand, remember and carry out simple instructions, learn with repetition, and sustain attention for more than two hours, as well as "interact with others on a very limited and superficial basis and perform routine tasks without supervision." AR19. The ALJ accepted those limitations as supported by the longitudinal medical evidence. Id.

But, Ms. Manco argues, the RFC as formulated by the ALJ did not comport with these limitations. Instead, the ALJ's formulation allowed for *occasional* interaction with supervisors, co-workers, and the general public. Ms. Manco asserts that o*ccasional* interaction is very different from *limited and superficial* interaction, with no supervision required. Ms. Manco argues that occasional interaction translates to interacting with others up to one-third of the work day, which is much more than the limited and superficial with no supervision required recommendation envisioned by the State agency psychological experts. Yet, Ms. Manco argues, the ALJ's formulation incorporated the less rigorous limitations without explaining why it deviated from the State agency opinions it purported to adopt. To compound the problem, Ms. Manco argues, the ALJ never asked the VE whether there are any jobs in the economy which can be performed within the actual limitations imposed by the State agency experts' articulated limitations. Therefore, Ms. Manco asserts, it is unknown whether any such jobs exist.

The Commissioner counters that the ALJ's determination about Ms. Manco's mental ability to function in the workplace is supported by substantial evidence in the record, and it is not the function of this court to reweigh the evidence. Furthermore, the Commissioner argues, the ALJ correctly interpreted the State Agency opinions when it determined Ms. Manco could "occasionally" interact with supervisors, coworkers, and the general public. Therefore, the Commissioner asserts, when the actual requirements of the DOT hand packager job are examined, there is no conflict between the RFC formulated by the ALJ and the expert psychological opinions to which it gave "great weight." Finally, the Commissioner notes the ALJ did not base his RFC findings exclusively upon the State agency psychological opinions in any event.

The court turns to the Commissioner's argument that there is no conflict between the State agency physicians' limitations and the RFC as the ALJ articulated it to the vocational expert. The VE testified that Ms. Manco's past work as a hand packager required interaction for only one-third of the day (i.e. occasional interaction). The Commissioner asserts the DOT description for the hand packager job makes clear that one third of the time ("occasional") is consistent with the phrase used by the State agency physicians ("limited interaction,") as it pertains to Ms. Manco's past relevant work as a hand packager.

The DOT description for a hand packager is found at Dictionary of Occupational Titles, (4th ed.); 1991 WL 687916. The Commissioner posits that one-third of the time spent interacting with others (which is the amount of time

59

required for a hand packager to interact according to the DOT description) is not inconsistent with the requirement to interact a "limited" amount of time, especially when one considers the type of interactions one has with other human beings as a hand packager.

Unskilled work requires interaction primarily with objects rather than people or data. SSR 85-15, 1985 WL 56857 at *4. The DOT job description of a hand packager reveals it carries an SVP of 2,[10] which the VE testified is an unskilled level job. Id.; AR114. The DOT description for hand packager does not identify any communication requirements. Dictionary of Occupational Titles, 1991 WL 687916 at * 1. The "people" category for the hand packager position shows it is "not significant" and is a level 8, which means "taking instructions-helping." Id. at *2. The Commissioner explains this means such a person would only be required to attend to work assignment instructions or the orders of a supervisor, and no immediate response would be required unless clarification of instructions or orders was needed. See DOT Appendix B.[11]

---

[10] SVP is an acronym for specific vocational preparation. See https://occupationalinfo.org/appendxc_1.html

[11] The Commissioner also posits that contrary to Ms. Manco's position, the comments in the State agency psychological reviewer's notes do not indicate she cannot be supervised, but rather than she need not be supervised when performing routine work tasks. This, the Commissioner asserts, is a positive rather than a negative trait. Pogue v. Astrue, 692 F. Supp. 2d 1088, 1101-02 (E.D. Mo. 2010). See also AR132, 145, 175 (State agency psychological reviewer's opinions noting Ms. Manco's ability to sustain an ordinary routine without special supervision is "not significantly limited," and that she can perform routinely "without supervision and make simple work-related decisions.") These reviewers also opined Ms. Manco's ability to respond

Finally, the DOT job description for a hand packager makes no mention that a hand packager would have any need at all to interact with the public or co-workers.  <u>Dictionary of Occupational Titles</u>, 1991 WL 687916 at * 1. Therefore, the Commissioner argues, a job that requires such un-complicated interaction for (at most) one-third of the day is not inconsistent with Ms. Manco's need for "limited and superficial" interaction—as it was phrased by the State agency psychiatric consultants.  The Commissioner therefore asserts that no discrepancy exists between the opinions the ALJ purported to adopt and the hypothetical it articulated to the VE at the administrative hearing.   On this score, the court agrees with the Commissioner.  The court does not discern a discrepancy between the State agency psychological consultants' limitations to which the ALJ gave "great weight" and the RFC it articulated to the VE.

Ms. Manco also asserts, however, that the ALJ erred by inappropriately weighing the medical opinions in the record.  Medical opinions are considered evidence which the ALJ will consider in determining whether a claimant is disabled, the extent of the disability, and the claimant's RFC.  <u>See</u> 20 C.F.R. § 404.1527.  All medical opinions are evaluated according to the same criteria, namely:

> --whether the opinion is consistent with other evidence in the record;

> --whether the opinion is internally consistent;

---

appropriately to criticism from supervisors was "not significantly limited."  <u>Id.</u> The court notes this opinion is in direct conflict with that of Dr. Fox, Ms. Manco's treating physician.  <u>See</u> AR811.

--whether the person giving the medical opinion examined
the claimant;

--whether the person giving the medical opinion treated the
claimant;

--the length of the treating relationship;

--the frequency of examinations performed;

--whether the opinion is supported by relevant evidence,
especially medical signs and laboratory findings;

--the degree to which a nonexamining or nontreating
physician provides supporting explanations for their
opinions and the degree to which these opinions
consider all the pertinent evidence about the claim;

--whether the opinion is rendered by a specialist about
medical issues related to his or her area of specialty;
and

--whether any other factors exist to support or contradict the
opinion.

See 20 C.F.R. § 404.1527(c)(1)-(6); Wagner v. Astrue, 499 F.3d 842, 848

(8th Cir. 2007).

"A treating physician's opinion is given controlling weight 'if it is well-

supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence.' "[12]

---

[12] Ms. Manco's claim was filed in June, 2015. The court takes a moment,
however, to observe that as to claims filed with the SSA after March 27, 2017,
the CFRs regarding acceptable medical sources, medical opinions, and how the
SSA must articulate the way it weighs the medical evidence, has been
completely re-written. See 20 C.F.R. §§ 614, 1520c

For example, for claims filed after March 27, 2017, though a provider
must still be an acceptable medical source to provide an opinion about the
existence of a medical impairment, all medical sources may provide medical

House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007) (quoting Reed, 399 F.3d at 920); 20 C.F.R. § 404.1527(c). "A treating physician's opinion 'do[es] not automatically control, since the record must be evaluated as a whole.' " Reed, 399 F.3d at 920 (quoting Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995)). The length of the treating relationship and the frequency of examinations of the claimant are also factors to consider when determining the weight to give a treating physician's opinion. 20 C.F.R. § 404.1527(c). "[I]f 'the treating physician evidence is itself inconsistent,' " this is one factor that can support an ALJ's decision to discount or even disregard a treating physician's opinion. House, 500 F.3d at 744 (quoting Bentley, 52 F.3d at 786; and citing Wagner, 499 F.3d at 853-854; Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005)). "The opinion of an acceptable medical source who has examined a claimant is entitled to more weight than the opinion of a source who has not examined a claimant." Lacroix v. Barnhart, 465 F.3d 881, 888 (8th Cir. 2006) (citing 20 C.F.R. §§ 404.1527)); Shontos v. Barnhart, 328 F.3d 418, 425 (8th Cir. 2003); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)).

---

opinions on other issues. The SSA, however, will not be required to articulate any particular weight (including controlling weight) assigned to the medical opinions in the file. Instead, the ALJ will consider the "persuasiveness" of all medical opinions (not only the acceptable medical source opinions) using the factors specified in the regulations. Supportability and consistency will be the most important factors, and usually the only factors the ALJ is required to articulate. Compare: 20 C.F.R. § 404.1520c (applicable to claims filed on or after March 27, 2017) to 20 C.F.R. § 1527(c) (applicable to claims filed before March 27, 2017). See also: https://www.ssa.gov/disability/professionals/bluebook/revisions-rules.html

When opinions of consulting physicians conflict with opinions of treating physicians, the ALJ must resolve the conflict. Wagner, 499 F.3d at 849. Generally, the opinions of non-examining, consulting physicians, standing alone, do not constitute "substantial evidence" upon the record as a whole, especially when they are contradicted by the treating physician's medical opinion. Id.; Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004) (citing Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999)). However, where opinions of non-examining, consulting physicians along with other evidence in the record form the basis for the ALJ's decision, such a conclusion may be supported by substantial evidence. Harvey, 368 F.3d at 1016. Also, where a nontreating physician's opinion is supported by better or more thorough medical evidence, the ALJ may credit that evaluation over a treating physician's evaluation. Flynn v. Astrue, 513 F.3d 788, 792 (8th Cir. 2008) (citing Casey, 503 F.3d at 691-692). The ALJ must give "good reasons" for the weight accorded to opinions of treating physicians, whether that weight is great or small. Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008).

Both State agency psychological reviewers (Dr. Muntz at the initial level and Dr. Buchkoski at the reconsideration level) relied heavily, if not exclusively on the examination and findings of the consulting examiner (Dr. Van Kley). See AR129, 172. The ALJ clearly found a conflict between the opinion of the State agency reviewers and Dr. Van Kley, because the ALJ gave "great weight" to the opinions of the State agency psychological reviewers, but only "some weight" to the opinions of Dr. Van Kley. AR19. But the ALJ failed to resolve

the conflict that it perceived between Dr. Van Kley's opinion and the opinions of the State agency psychological reviewers—at least in any manner which is reviewable by this court.

First, the ALJ made only very limited reference to Dr. Van Kley's findings. AR19. The ALJ referred to Dr. Van Kley's statement indicating "employment opportunities will be limited by her intellectual deficits, even though she is capable of learning and retaining new information with repeated exposure . . ." The ALJ stated "the undersigned accepts that the claimant is capable of performing repetitive tasks and that she is limited, but disabled." Id. Ms. Manco refers to this statement by the ALJ as "confusing," (Docket 18, p. 10), while the Commissioner refers to it as a typographical error (Docket 23, p. 19, n.5). Because the ALJ clearly concluded Ms. Manco is not disabled (AR21), the court concurs with the Commissioner—it was a typographical error.

Ms. Manco notes that the ALJ failed to mention at all in its written decision the following observations made by Dr. Van Kley: Ms. Manco conveyed information in a "markedly disorganized manner," often jumping from one topic to another and frequently becoming lost in irrelevant details; she asserted she was able to get along with others, yet she had no friends outside her own family, reported numerous altercations, and her four marriages had all been fraught with drama. Additionally, Dr. Van Kley's notes indicated "it is important to note that [Ms. Manco] would be prone to react in a volatile manner in response to stress of any sort, having difficulty considering alternatives such as simply ignoring potentially confrontational situations."

AR705.  Dr. Van Kley also noted that because she presented as an individual with average intelligence, others might become frustrated with her need for repetition, leading to her employers getting frustrated with Ms. Manco's performance problems.  AR709.

Further, the ALJ did not explain why, even though the State agency physicians relied exclusively upon and gave "great weight" to Dr. Van Kley's consultative exam to form their opinions, the ALJ gave "great weight" to the opinions of the State agency psychological reviewers but only "some" weight to Dr. Van Kley's opinions.  The court agrees with Ms. Manco that pursuant to the SSA's own regulations and other relevant authority in this jurisdiction, the ALJ was required to resolve the conflict.  <u>Wagner</u>, 499 F.3d at 849.  Resolving the conflict involves more than just finding one opinion more persuasive than the other—the ALJ must explain *why* it found one opinion more persuasive, using the factors found in 20 C.F.R. § 1527(c).  But in its written decision, the ALJ offered <u>no</u> reason whatsoever for why it was more persuaded by State agency physicians who never saw or treated Ms. Manco than by the consultative examiner who did see and examine her, and upon whose test results the State agency consultants based their opinions.  This was error.

The ALJ's analysis seems exactly backwards. Dr. Van Kley examined and met with Ms. Manco and the State agency psychologists did nothing but review Dr. Van Kley's written records to form their opinions. <u>See</u> 20 C.F.R. § 1527(c)(1) (stating "generally, we will give more weight to the medical opinion

of a source who has examined you than the medical opinion of a source who has not examined you.").

Furthermore, Ms. Manco argues, the ALJ erred in its analysis of Dr. Fox's opinions. Dr. Fox completed a medical source statement dated June 15, 2017, in which she gave her opinions as to Ms. Manco's ability to perform work-related activities on a full-time basis. AR810-12. Dr. Fox stated Ms. Manco would have moderate limitations understanding and remembering simple instructions, carrying out simple instructions, and responding appropriately to usual work situations and changes in routine work settings. AR810-11. Dr. Fox also identified areas of marked limitation where Ms. Manco would have a substantial loss in her ability to effectively perform the activity, including her ability to make judgments on simple work-related decisions; understanding and remembering; carrying out, or making judgments on complex instructions; and interacting appropriately with supervisors or co-workers. AR810-11.

Dr. Fox opined Ms. Manco had a learning disorder, had been in special education, and often does not maintain good boundaries with co-workers and supervisors. AR811. She was very friendly but often misinterpreted directions from supervisors. <u>Id</u>. Dr. Fox believed Ms. Manco was compassionate but often found herself entangled in the "drama" of others' lives, and that she got extremely angry when confronted by co-workers and supervisors. <u>Id.</u> These limitations, Dr. Fox advised, had been present at least since Dr. Fox began treating Ms. Manco in June, 2013. <u>Id.</u>

The ALJ accepted Dr. Fox's opinions which imposed moderate limitations but rejected Dr. Fox's opinions which imposed marked limitations. The entirety of the ALJ's explanation for the partial acceptance and partial rejection of Dr. Fox's opinions is as follows:

> The undersigned accepts that the claimant has moderate limitations but rejects the findings of marked limitations as inconsistent with the mental status examination observations in the record as well as the testing results (EX 6F, 9F, 12F).[13] Therefore, those statements are afforded some weight to the extent they support the limitations in the residual functional capacity assessment as set forth above.

AR19.

Ms. Manco concedes the limitations assigned by Dr. Fox are consistent with the ALJ's own formulation of the RFC except Dr. Fox indicated Ms. Manco has a "marked" limitation on her ability to interact with others, whereas the ALJ's formulation of the RFC found Ms. Manco had the ability to interact with others "occasionally" or up to one-third of an eight-hour workday. Compare AR811 with AR14.

The court begins with the ALJ's rationale for only partially accepting Dr. Fox's opinions (those that were supportive of the RFC as formulated by the ALJ) but rejecting the remainder of Dr. Fox's opinion (that portion which imposed "marked" limitations). The ALJ indicated it rejected a portion of Dr. Fox's opinion because it was inconsistent with the "mental examination observations in the record as well as the testing results." AR19. The ALJ cited

---

[13] These administrative exhibits refer to the entirety of Dr. Fox's medical records (EX 6F and 12F) and to Dr. Van Kley's consultative exam (EX 9F).

to Dr. Fox's own records and Dr. Van Kley's consultative exam records (EX 6F, 9F, 12F) as supportive of this statement. The ALJ explained that it favored the non-examining, non-treating State agency opinions over those of Dr. Fox and Dr. Van Kley because they were "supported by the longitudinal medical evidence of record as a whole showing independence in activities of daily living, the testing results in the record and the mental status examination observations," again citing Dr. Fox and Dr. Van Kley's records (EX 6F, 9F and 12). But this statement is painted with such a broad brush that it gives the court no idea what the ALJ considered supportive or non-supportive of Dr. Fox's opinions in either her own records or Dr. Van Kley's consultative exam.

A general reference to the entirety of Dr. Fox's records, and to the entirety of Dr. Van Kley's consultative exam as being inconsistent with Dr. Fox's "marked" limitation restrictions does not constitute "good reason" as that phrase is used in Hamilton, 518 F.3d at 610; 20 C.F.R. § 1527(2)(c)(2). In Farringer v. Colvin, 969 F. Supp. 2d 1144, 1155 (D. Neb. 2013) the court wrestled with the same problem but declined to shrug it off as the ALJ's opinion-writing deficiency. Id. The ALJ in Farringer –as here— "identified nothing in particular in [the treating physician's] treatment notes that is inconsistent with [her] opinion." Id. at 1155. The court explained it did not "view this standard of review as requiring it to go blindly hunting through a claimant's medical records looking for inconsistencies upon which the ALJ might have relied." Id. at 1156.

69

The court is at a double disadvantage here, because as explained above, the ALJ likewise failed to offer any explanation whatsoever about why it found the State agency psychologist opinions more persuasive than the opinion of the consultative examiner upon whose records the State psychologists based their findings. On this portion of Ms. Manco's assignment of error, the court concurs with Ms. Manco. The ALJ did not properly consider the persuasiveness of the medical evidence in the file as to Ms. Manco's mental impairments. On remand, the ALJ is instructed to comply with the regulations and case law which instruct that "good reasons" must be provided so this court may conduct a proper review.

> **2.** **Whether the Commissioner's Step 4 Finding That Ms. Manco Can Perform Her Past Relevant Work as A Hand Packager is Supported by Substantial Evidence**

Ms. Manco's final assertion of error is that the ALJ's determination she can return to her past relevant work as a hand packager is not supported by substantial evidence. Ms. Manco cites three reasons in support of this claim error: (1) the RFC formulated by the ALJ included no manipulative limitations or explanation about why none were included but the hypothetical articulated to the VE limited bilateral handling, fingering and feeling to the "frequent" level; (2) the hand packager job which is Ms. Manco's past relevant work and which the VE indicated was compatible with the ALJ's hypothetical indicates it requires "constant" reaching, handling and fingering according to the DOT description, DOT # 920-587-018.; and (3) neither the VE nor the ALJ ever identified nor explained the conflict between the ALJ's hypothetical, the DOT

description of the hand packager job, and the VE's indication that Ms. Manco was capable of performing the job.

The Commissioner counters that the three mistakes identified by Ms. Manco do not really matter, because Ms. Manco failed to prove that she had any manipulative impairments in the first place and the RFC as ultimately articulated by the ALJ's decision do not include any manipulative limitations. So, according to the Commissioner, any discrepancy as to the manipulative requirements between the ALJ's hypothetical and the description of the hand packager job as it is found in the DOT's description of the job is harmless error, citing <u>Van Vickle v. Astrue</u>, 539 F.3d 825, 830 (8th Cir. 2008).

In the usual course when the ALJ deems the claimant unable to return to her past relevant work, the ALJ ultimately incorporates into its decision the RFC (or one of the iterations of the RFC) as it was recited in the hypothetical to the VE at the administrated hearing. That is not what happened here. AR114. This is because ultimately, the ALJ determined after the hearing that Ms. Manco *was* physically and mentally capable of returning to her past relevant work as a hand packager—thereby mooting the need for the testimony of a vocational expert to determine whether Ms. Manco was disabled. <u>Lewis v. Barnhart</u>, 353 F.3d 642, 648 (8th Cir. 2003).

In the hypothetical to which the VE responded Ms. Manco was capable of her former hand packaging job, the ALJ limited the individual to *frequent* bilateral handling, fingering, and feeling. <u>Id.</u> The VE indicated such a person could perform Ms. Manco's past relevant work as a hand packager (AR115)

71

without acknowledging or explaining the discrepancy between the DOT description of the hand packager job which indicates it requires *constant* reaching, handling and fingering.  See DOT 920.587-018 at pp. 3-4, 1991 WL 687916 at *3-4.  The Commissioner acknowledges the VE erred in this conclusion.  See Docket 23, p. 26.

The court therefore has no way to know whether the VE's conclusion (that Ms. Manco really could have returned to her past relevant work as a hand packager despite the ALJ's tweaking the hypothetical to include manipulative limitations of *frequent* bilateral handling, fingering and feeling) would or could have been supported by substantial evidence.  This is because the ALJ has an "affirmative responsibility to ask about any possible conflict" between VE evidence and the DOT as to requirements of a job or occupation before relying on VE evidence to support a determination of disabled or not disabled.  Kemp v. Colvin, 743 F.3d 630, 633 (8th Cir. 2014).  Where neither the VE or the ALJ apparently recognize the conflict and the ALJ does not ask the VE whether one exists, the Commissioner does not meet its burden at step five of the analysis to establish that jobs exist in the economy that the claimant can perform.  Id. In Kemp the situation was the same as in this case; the job identified by the VE required constant reaching, while the ALJ's hypothetical included the ability of only occasional reaching.  Id.  The court found the VE's testimony was insufficient to establish the claimant was not disabled.  Id.

The problem with the Commissioner's theory is that the ALJ specifically acknowledged that Ms. Manco had severe impairments of degenerative cervical

disc disease and small fiber neuropathy.  And for the reasons already explained in section E.1.a  of the ANALYSIS section of this opinion, the court rejects the Commissioner's assertion that the ALJ's failure to assign any manipulative limitations or to explain its reason for failing to do so, constitutes harmless error.  It follows then that the court likewise rejects the Commissioner's argument here that because Ms. Manco did not have any manipulative limitations anyway, the ALJ's failure to incorporate them into the RFC or the hypothetical to the VE are irrelevant.

The Commissioner asserts the hypothetical RFC articulated to the VE is irrelevant because it was not the hypothetical RFC that the ALJ ultimately adopted, but a different RFC altogether.  In the RFC it ultimately adopted, the ALJ did not impose *any* manipulative limitations beyond lifting 50 pounds occasionally and 25 pounds frequently.[14]  See AR14.

Therefore, the Commissioner argues, there is no discrepancy between the hand packager job the ALJ determined Ms. Manco could perform and the job as it is described by the DOT.  And because the ALJ ultimately determined Ms. Manco could return to her past relevant work, that the VE's testimony might be flawed does not matter because it was superfluous anyway.

---

[14] The court notes that "occasionally" is defined as up to one-third of the time.  Owens v. Colvin, 727 F.3d 850, 851 (8th Cir. 2013).  One-third of an 8-hour work day is slightly more than 2.5 hours.  Ms. Manco was 52 years old the year her ALJ hearing was held.  Only a very, very few extremely fit 52-year-old women could lift 50 pounds 2.5 hours a day every working day.  It defies logic to imagine Ms. Manco with her small fiber neuropathy, her cervical spine deformities, and her cane (because of episodes of falling) could do so.

This argument would all make sense if the premise was supported by substantial evidence. That is, *if* the ALJ's formulation of the RFC was supported by substantial evidence, then the VE's testimony would have no bearing. But because the court has concluded the RFC as it was formulated by the ALJ is *not* supported by substantial evidence, neither is the conclusion that Ms. Manco can perform the hand packager job even assuming the DOT description of that job conforms with the ALJ's formulation of the RFC.

This case must be remanded for further development of the record to determine Ms. Manco's proper physical limitations and her appropriate RFC. Only then can the ALJ properly determine whether Ms. Manco remains capable of her past relevant work and if not, whether pursuant to 20 C.F.R. § 1520(f) any substantial gainful activity exists in the national economy which Ms. Manco can perform. To make this determination, the ALJ shall consider Ms. Manco's RFC, along with her age, education, and past work experience. Id.

**F.    Type of Remand**

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. Ms. Manco requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider her case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration. It authorizes two types of remand orders: (1) sentence four

remands and (2) sentence six remands. A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling. Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000). A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings. Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." Buckner, 213 F.3d at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. Id.; Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated. See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues

have been resolved and the record supports a finding of disability).  Therefore,

a remand for further administrative proceedings is appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, it is

hereby ORDERED that the Commissioner's decision is REVERSED and

REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

DATED April 8, 2019.

BY THE COURT:

_____

VERONICA L. DUFFY
United States Magistrate Judge